**In re LANDSCAPE ASSOCIATES, INC., Debtor.**

**Bankruptcy No. LR 85–663M.**

United States Bankruptcy Court, E.D. Arkansas, W.D.

July 1, 1987.

C. Richard Crockett, Little Rock, Ark., for debtor.

Richard D. Taylor, Little Rock, Ark., for First Pyramid.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On May 9, 1985, Landscape Associates, Inc., (debtor) filed a voluntary petition for relief under the provisions of chapter 11 of the Bankruptcy Code. The schedules listed total assets of $1,500,000.00 and total liabilities of $800,000.00. On February 19, 1987, the debtor filed its third proposed plan of reorganization. A confirmation hearing was held on May 6, 1987, and the case was taken under advisement. The following constitutes the Court's findings of fact and conclusions of law as required by Bankruptcy Rule of Procedure 7052. The matters presented are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has jurisdiction to render a final judgment.

The debtor's principal asset consists of an undeveloped tract of real property located in Little Rock, Arkansas. The debtor estimates the real property's value to be in excess of $1,500,000.00, and that estimate is not seriously disputed by any of the creditors. The property is best suited for quality residential and commercial development. First Pyramid Life Insurance Company ("First Pyramid") claims a lien on the debtor's real property to secure an indebtedness of approximately $400,000.00. The indebtedness to First Pyramid is based on a promissory note in the original principal sum of $300,000.00 and accrued interest of approximately $100,000.00. The note was scheduled to be paid in monthly installments of $3,497.50 beginning December 1, 1983, through November 1, 1990, at which time the entire unpaid principal balance and accrued interest would become due. No payment has been made on the note since November 1984, and interest continued to accrue at the rate of 13½% per annum on the unpaid principal as of the hearing date.

On October 9, 1985, First Pyramid filed a motion to lift the automatic stay, or in the alternative, to convert the case to chapter 7 or to dismiss the case. On November 17, 1985, an order was entered denying the motion. The evidence at that hearing established the existence of a substantial equity cushion.

On December 27, 1985, a proposed plan of reorganization was filed by the debtor. A confirmation hearing was held on March 26, 1986, and an order was entered denying confirmation and giving the debtor thirty days in which to file a new plan. The debtor filed a notice of appeal from the

order denying confirmation, but dismissed the appeal in January 1987.

On June 18, 1986, the debtor filed a new plan but made no effort to obtain confirmation. On June 26, 1986, First Pyramid filed a second motion for relief from the automatic stay, and a hearing was held on October 15, 1986. First Pyramid's second motion for relief was denied, but on the condition that the case would be dismissed without further notice or hearing unless the debtor obtained an order confirming a plan on or before May 9, 1987. A third plan of reorganization was filed February 19, 1987, and the confirmation hearing was held May 6, 1987.

The three plans submitted by the debtor contained the same basic proposal—an arm's-length sale of the debtor's real property at some point in the future. Each plan proposed to pay all creditors in full, plus interest, and retain a surplus for the equity security holders. First Pyramid has voted to reject each plan.

The principal reason the Court denied confirmation of the first plan submitted by the debtor was that the interest rate provided for in the plan was to equal the discount rate of the Federal Reserve Bank of St. Louis, but would not exceed 10% per annum or fall below 6% per annum. The Court held that this rate of interest was below market rate and that it did not assure First Pyramid of receiving the present value of its secured claim. The plan also misclassified First Pyramid's claim by placing its claim in a class with other secured creditors. The debtor made no effort to obtain confirmation of its second proposed plan.

The third plan was filed March 20, 1987, and proposed to sell the real property subject to First Pyramid's lien on or before three years from the date of confirmation and to pay First Pyramid's allowed claim in full. The plan proposed to pay First Pyramid a fixed rate of interest equal to the prime rate published in the *Wall Street Journal* on the confirmation hearing date. The rate specified in First Pyramid's note is 13½% per annum.

Because First Pyramid was an impaired creditor and objected to the proposed plan, the plan had to satisfy the cramdown requirements set forth in 11 U.S.C. § 1129(b) in order to be confirmed.[1] *See* 11 U.S.C. § 1129(a) and (b)(1). Section 1129(b) provides that the plan must be fair and equitable to a dissenting class of secured creditors, and that the plan must pay the equivalent of the present value of all fully secured impaired claims.

5 *Collier on Bankruptcy* ¶ 1129.03[4][i] (15th ed. 1987), describes present value as follows:

The concept of "present value" is of paramount importance to an understanding of section 1129(b). Simply stated, "present value" is a term of art for an almost self evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month or a year hence. Part of the "present value" concept may be expressed by a corollary proposition: a dollar in hand today is worth exactly the same as (1) a dollar to be received a day, a month or a year hence plus (2) the rate of interest which the dollar would earn if invested at an appropriate interest rate.

The appropriate rate of interest for calculating the present value of a claim is the current market rate for a loan under similar circumstances. *See In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653 (Bkrtcy.D.N.J.1980); *In re Sullivan,* 26 B.R. 677 (Bkrtcy.W.D.N.Y.1982); Klee, *All*

---

**1.** Section 1129(b)(2)(A)(i)(I) and (II) and (b)(2)(A)(iii) require that the plan provide:

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

. . . .

(iii) for the realization by such holders of the indubitable equivalent of such claims.

*You Ever Want to Know About Cramdown Under the New Bankruptcy Code*, 53 *Am.Bankr.L.J.* 133, 156–58 (1979).

The factors to be considered in determining the appropriate rate of interest are stated in 5 *Collier on Bankruptcy* ¶ 1129.03[4][i] (15th ed. 1987) as follows:

The appropriate discount [interest] rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount [interest] rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

*See In re Smithfield Estates, Inc.*, 52 B.R. 220, 225 (Bkrtcy.D.R.I.1985) ("The risk involved as to the certainty of payments in this case clearly requires a 2% increase over government bonds."); *In re Martin*, 66 B.R. 921, 927 (Bkrtcy.D.Mont.1986) (based on bank officer's testimony, 9.5% interest was established as the present market rate of interest for an agricultural loan in the area of the debtor's property where there was adequate security).

In support of the debtor's choice of the "prime rate" as the appropriate interest rate in the plan, the deposition of Dr. Rawleigh H. Ralls was introduced. Dr. Ralls testified that the "prime rate" was a rate usually set by major New York banks for their preferred customers, and that it was a market rate. On cross-examination he admitted that prime rate "is loaned by lenders to borrowers who have virtually zero risks of default on the indebtedness to the lender." Dr. Ralls also stated that the value of collateral was a factor and that other factors such as the capacity of the borrower to repay the loan, the borrower's past history, and cash flow to service the debt were typically considered. He stated that he had never been able to borrow money at a prime rate. Curtis Goodfellow, an officer of the debtor, also testified that the debtor had never been able to secure a prime rate loan.

There was no evidence introduced that the interest rate which large New York banks charge their preferred customers is the same as the prevailing rate for the type and quality of loan present here. The plan proponent has the burden to show that the proposed interest rate is adequate, and the debtor has failed to convince the Court that the prime rate as published in the *Wall Street Journal* reflects the appropriate market rate of interest. *See In re Snedaker*, 32 B.R. 29 (Bkrtcy.S.D.Fla. 1983). Confirmation of the plan is therefore denied because it, like the two plans previously submitted, does not propose to pay First Pyramid the present value of its allowed claim.

The debtor has failed in three attempts to submit a plan which complies with the requirements of 11 U.S.C. § 1129. In each case the proposed plan failed primarily due to the lack of an appropriate interest rate for calculating the present value of claims. The Court's order denying relief from the stay on First Pyramid's second request stated that if the debtor failed to obtain a confirmed plan by May 7, 1987, grounds would exist to dismiss this case without further notice or a hearing, upon *ex parte* application by First Pyramid. At the hearing on the second motion for relief from the stay, the debtor was advised that First Pyramid was entitled under the law to receive interest based on the market rate and that the debtor was squandering the time allowed by the Court for obtaining a confirmed plan. It is difficult to understand the debtor's recalcitrant attitude regarding payment of an appropriate market rate of interest to First Pyramid. First Pyramid's note accrues interest at the rate of 13.5% per annum, and there has been testimony that interest rates have declined substantially below that rate since the note was executed.

This case has been pending in this Court for twenty-five months. A picture of bad faith has now emerged because of the amount of time the case has been pending without a confirmed plan and the debtor's repeated attempts to pay First Pyramid an unreasonably low interest rate. The evidence indicates that no attempt has been made to refinance First Pyramid's indebt-

edness, even though the amount of equity in the property indicates that refinancing is feasible. First Pyramid has not received a payment since 1984, and the debtor seems intent on continuing with pointless litigation in this Court under a misapprehension that the existence of a substantial equity cushion will permit the case to remain pending indefinitely without a plan. Because of the debtor's apparent ability to pay all of its creditors in full and to retain a substantial surplus from a conventional refinancing outside the context of a bankruptcy proceeding and the debtor's failure in three attempts to propose to pay the proper amount of interest, this Court is no longer reluctant to dismiss the case.

Confirmation is denied, and pursuant to 11 U.S.C. § 1112(b), which provides that the dismissal of a case must be preceded by notice and a hearing, the clerk is ordered to send notice to creditors and parties in interest to show cause why this case should not be dismissed.

IT IS SO ORDERED.